KARIN G. PAGNANELLI (174763)
  kgp@msk.com
MARC E. MAYER (190969)
  mem@msk.com
DANIEL A. KOHLER (285501)
  dxk@msk.com
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683
Telephone:   (310) 312-2000
Facsimile:   (310) 312-3100

Attorneys for Plaintiff
Blizzard Entertainment, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BLIZZARD ENTERTAINMENT, INC., a Delaware Corporation,<br><br>               Plaintiff,<br><br>        v.<br><br>CEILING FAN SOFTWARE, LLC, an Ohio Limited Liability Company; BRIAN BECKER, an individual; STANTON FRASER, an individual; and DOES 1 through 10,<br><br>               Defendants. | Case No. 12-0144 JVS (JPRx)<br><br>The Honorable James V. Selna<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF BLIZZARD ENTERTAINMENT, INC. IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Response to Statement of Uncontroverted Facts; Statement of Additional Uncontroverted Facts; Evidentiary Objections; and Declaration of Daniel A. Kohler filed concurrently herewith]<br><br>Date:        September 16, 2013<br>Time:        1:30 p.m.<br>Ctrm.:        10C |

Mitchell
Silberberg &
Knupp LLP

5487481.10

---

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

Introduction.................................................................................................1

I.     STATEMENT OF FACTS ..............................................................3

II.    BLIZZARD, NOT DEFENDANTS, IS ENTITLED TO SUMMARY
       JUDGMENT ON ITS TORTIOUS INTERFERENCE CLAIM. ................10
       A.    Defendants Engaged In Intentional Acts Designed To Induce
             Breaches of The ToU and EULA.........................................11
       B.    Defendants' Conduct Resulted In Breaches Of The EULA and
             TOU......................................................................14
       C.    Blizzard Has Suffered Harm From The Breaches Caused By
             Defendants' Interference...............................................16

III.   DEFENDANTS' PURPORTED AFFIRMATIVE DEFENSES ARE
       MERITLESS. ...........................................................................20
       A.    Defendants Cannot Invoke A "Competitor's Privilege." ................20
       B.    Defendants' Interference Is Not Justified By Any "Legally
             Protected Interest".....................................................22

IV.    DEFENDANTS ARE LIABLE FOR BREACH OF CONTRACT. ............24

V.     DEFENDANTS ARE LIABLE FOR UNFAIR COMPETITION AND
       UNJUST ENRICHMENT. ..............................................................25

Conclusion ................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## CASES

<u>Am. Airlines, Inc. v. Platinum World Travel,</u>
769 F. Supp. 1203 (D. Utah, 1990) ............................................................ 16, 18

<u>Am. Motorcycle Assn. v. Superior Court,</u>
20 Cal. 3d 578 (1978) ................................................................................. 19

<u>Arista Records LLC v. Usenet.com, Inc.,</u>
633 F. Supp. 2d 124 (S.D.N.Y. 2009) ........................................................ 12

<u>Bank of N.Y. v. Fremont Gen. Corp.,</u>
523 F.3d 902 (9th Cir. 2008) ...................................................................... 18

<u>Betaseed, Inc. v. U & I, Inc.,</u>
681 F.2d 1203 (9th Cir. 1982) .................................................................... 22

<u>California Concrete Pipe Co. v. American Pipe & Constr. Co.,</u>
288 F. Supp. 823 (C.D. Cal. 1968) ............................................................. 15

<u>Cassinos v. Union Oil Co.,</u>
14 Cal. App. 4th 1770 (1993) ..................................................................... 18

<u>Craigslist, Inc. v. Kerbel,</u>
No. 11-3309, 2012 U.S. Dist. LEXIS 108573 (N.D. Cal. Aug. 2, 2012) ........... 13

<u>Craigslist, Inc. v. Naturemarket, Inc.,</u>
694 F. Supp. 2d 1039 (N.D. Cal. 2010) ........................................... *passim*

<u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.,</u>
11 Cal. 4th 376 (1995) ........................................................................ 11, 21

<u>East County Physicians Med. Group, Inc. v. Aetna Life and Cas. Co.,</u>
No. D038241, 2003 Cal. App. Unpub. LEXIS 5768, at *25 (2003) ................. 22

<u>Envtl. Planning & Info. Council v. Superior Court,</u>
36 Cal. 3d 188 (1984) ................................................................................. 20

<u>Leko v. Cornerstone Bldg. Inspection Service,</u>
86 Cal. App. 4th 1109 (2001) ..................................................................... 19

Mitchell
Silberberg &
Knupp LLP

5487481.10

1
2
3

**TABLE OF AUTHORITIES**
<u>(continued)</u>

**<u>Page(s)</u>**

MDY Indus., LLC, v. Blizzard Entertainment, Inc.,
  No. CV-06-2555, Docket No. 82, Order
  re: Summary Judgment (D. Ariz. July 14, 2008) ................................................ 11

MDY Indus., LLC, v. Blizzard Entertainment, Inc.,
  629 F.3d 928 (9th Cir. 2010) ......................................................................*passim*

Metro-Goldwyn-Mayer Studios, Inc. v. Grokster,
  545 U.S. 913 (2005) ....................................................................................... 13

Motise v. Am. Online, Inc.,
  346 F. Supp. 2d 563 (S.D.N.Y. 2004) ............................................................ 25

Nelson v. Pima Community College,
  83 F.3d 1075 (9th Cir. 1996) ......................................................................... 15

Pac. Gas & Elec. Co. v. Bear Stearns & Co.,
  50 Cal. 3d 1118 (1990) .................................................................................. 10

Planet Goalie, Inc. v. MonkeySports, Inc.,
  No. 11-07263, 2013 U.S. Dist. LEXIS 57499
  (C.D. Cal., April 22, 2013) ....................................................................... 23, 24

Quelimane Co. v. Stewart Title Guar. Co.,
  19 Cal. 4th 26 (1998) .......................................................................... 11, 12, 13

Richardson v. La Rancherita,
  98 Cal. App. 3d 73 (Cal. App., 1979) ............................................................ 22

Shore Invs., Inc. v. Bhole, Inc.,
  2011 Del. Super. LEXIS 537, at *38
  (Del. Super. Ct. Nov. 28, 2011) ..................................................................... 21

Ticketmaster L.L.C. v. RMG Technologies, Inc.,
  507 F. Supp. 2d 1096 (C.D. Cal. 2007) .......................................................... 24

Twitter, Inc. v. Skootle Corp.,
  No. C 12-1721 SI, 2012 U.S. Dist. LEXIS 87029
  (N.D. Cal. June 22, 2012) ........................................................................ 14, 17

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell
Silberberg &
Knupp LLP

5487481.10

iii

**BLIZZARD'S MOTION TO DISMISS DEFENDANTS' FIRST AMENDED COUNTERCLAIMS**

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

Viner v. Sweet,
    30 Cal. 4th 1232 (2003)..................................................................... 19

## OTHER AUTHORITIES

2 Schwing, California Affirmative Defenses, at 327 (2013 ed.)............................ 20

Restatement (Second) of Torts
    § 768 ................................................................................ 20, 21
    § 773 ...................................................................................... 22

**Introduction**

The Motion of Defendants Ceiling Fan LLC, Brian Becker, and Stanton Fraser ("Defendants") does not even attempt to satisfy Defendants' burden of proof on summary judgment.  Rather, Defendants' Motion is a preemptive Opposition to Blizzard's (simultaneously filed) Motion for Summary Judgment, designed only to cloud and confuse the issues presented in Blizzard's Motion.  Instead of proffering any tangible evidence to support any of their defenses to liability, Defendants offer only a hodgepodge of hypothetical arguments and purported affirmative defenses that purport (but fail) to raise issues of disputed fact.  Defendants' arguments, at best, are irrelevant and, at worst, misstate the law and ignore the undisputed facts.

As set forth in Blizzard's Motion, the facts are straightforward and largely undisputed.  Blizzard is a computer game developer and the owner of the popular subscription-based online multiplayer game "World of Warcraft" ("WoW").  Blizzard provides its customers with access to WoW based on their assent to a Terms of Use ("ToU") and End-User License Agreement ("EULA") that prohibit the use of "cheats, automation software (bots), hacks, mods, or any other unauthorized third-party software designed to modify the World of Warcraft experience."  With full knowledge of this unambiguous contractual restriction, Defendants develop, market, distribute, update and administer (and use themselves) two software products ("Pocket Gnome" and "Shadow Bot," collectively, the "Bots") that fully automate WoW gameplay.  Defendants have sold at least 7,000 of their Bots (100-120 of which they claim are being used at any given time), for which they have received hundreds of thousands of dollars.  Defendants' products and customers have been the target of thousands of complaints by WoW players, and Blizzard has incurred significant harm and expense fighting and detecting bots (including Defendants' Bots), responding to customer complaints, banning and suspending the accounts of players who bot (including many of Defendants' customers), servicing characters that are secretly

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

controlled by Defendants' Bots, and attempting to remediate the broader adverse impacts that botting has on its game and to which Defendants contribute.

Defendants' liability is clear and indisputable.  Defendants agree that: (1) the ToU and EULA are binding and enforceable contracts, (2) they have been aware of the ToU and EULA at all relevant times (and, in fact, opened their business knowing that the use of their products violated these contractual restrictions), (3) the use of the Bots necessarily violates the ToU and EULA (including because the Bots have no purpose other than to automate WoW gameplay), and (4) more than 6,000 of their customers used the Bots in WoW, thereby breaching the ToU and EULA (including all versions of those contracts) on a regular and ongoing basis. Defendants also do not contest that they encourage, advocate and assist the use of their Bots in WoW, continuously administer, support, and update the Bots, or that the Bots contribute to the harm suffered by Blizzard.  None of the arguments asserted by Defendants are sufficient even to raise an issue of fact as to their liability, let alone warrant summary judgment in *Defendants*' favor:

● Defendants claim that they did not engage in any overt acts designed to interfere with the ToU and EULA, ignoring that they advertise and promote their products for use in violation of the ToU and EULA, provide ongoing customer support and assistance, activate and monitor their customers' use of the Bots, provide advice about how to avoid detection by Blizzard, and repeatedly tell users that (notwithstanding the ToU and EULA) their products are "low risk" and will not result in account suspension if the user is "smart."

● Defendants pose a variety of improbable hypothetical scenarios, such as that some users *might* have purchased the Bots and not used them (or waited months to use them), might have purchased the Bots before subscribing to WoW, might have quit if they could not bot, or might only have used the Bots to "catch up" with friends.  Defendants offer no support for these theories.  In any event, *when* or *why* Defendants' customers used the Bots is irrelevant.

●     Defendants proffer a litany of purported "admissions" that they claim raise issues as to whether their conduct caused certain specific categories of damages.  But these purported "admissions" are not relevant to liability.  They are quibbles about the precise calculation of damages, and do not contravene the undisputed fact that Defendants' Bots cause harm to Blizzard.  Defendants' "others do it too" defense is not a defense at all, even if those "others" occupy a larger share of the market.

●     Defendants conflate the discrete torts of (1) intentional interference with contractual relations and (2) interference with prospective business advantage. They then make the incorrect claim that they are interfering with a "terminable at will" contract, ignoring that when Blizzard's customers buy and use Defendant's Bots in violation of the ToU and EULA, they not "terminating" "at-will" contracts (such as by quitting the game), but instead are secretly breaching their contractual obligations while Blizzard continues to perform its own obligations.

●     Defendants argue two (previously unasserted) affirmative defenses. Defendants' ignore that one of those defenses (the "competitor's privilege") is never a defense to the interference claims at issue, and the other ("legally protected interest") does not apply because Defendants are not seeking to protect any "interest" worthy of any legal protection, including any business relationship that existed prior to, or independently of, the ToU and EULA.

For the reasons set forth below (and in Blizzard's Motion), Defendants' Motion should be denied.  Judgment should be entered in favor of *Blizzard* on its claims for intentional interference, breach of contract, and unfair competition.

# I.     STATEMENT OF FACTS[1]

**Blizzard and World of Warcraft.**  Blizzard is a premier computer game developer and publisher whose products include the hugely popular online role-

---

[1]  A detailed factual background is set forth in Blizzard's Motion.  For convenience, the undisputed facts relevant to Defendants' Motion are repeated here and in Blizzard's Statement of Additional Undisputed Facts ("ASUF").

playing game "World of Warcraft."  Blizzard's Separate Statement of Additional Undisputed Facts ("ASUF 151").  WoW is a "massively multiplayer online role-playing game" ("MMORPG"), which is a type of game in which players from around the world collectively participate and play in a vast virtual world populated by monsters, creatures, and characters created by Blizzard.  ASUF 152.  In WoW, thousands of players simultaneously share the online experience and engage in a variety of online activities, such as cooperative and competitive play and online chatting.  ASUF 153.  Players' ability to interact with one another on a large scale in the pursuit of various achievements constitutes an integral component of WoW's appeal and commercial success.  ASUF 154.  The WoW virtual world is a highly curated, carefully constructed game world that is designed to be consistently fun and interesting.  ASUF 155.  Blizzard spends enormous sums of money and countless hours testing the game and refining its gameplay to ensure that the game is fun, fair, and provides equal challenges to all players.  ASUF 156.

WoW is the product of tens of millions of dollars and the work of thousands of people, including artists, programmers, sound designers, and computer engineers.  ASUF 157.  Blizzard spends hundreds of thousands of dollars each month to update the game, maintain its computer servers, and provide ongoing customer support.  ASUF 158.  In order to recoup its massive investment in the game, and support the continued maintenance of the game, Blizzard charges a monthly subscription fee.  ASUF 159.  It is critical to Blizzard's business model that the WoW game world functions as designed, and offers fair, interesting, and compelling challenges to its players.  ASUF 160.  Users who grow frustrated or bored with the game will quit, depriving Blizzard of the subscription fees and user base it needs to support and grow the game.  ASUF 160.

**The WoW EULA and TOU.**  Among the ways that Blizzard ensures that users do not abuse or damage the WoW game world is by entering into contracts with its users.  ASUF 161.  In order to play WoW, a user must agree to two

separate contracts, the "World of Warcraft End User License Agreement" ("EULA") and the "Terms of Use" ("ToU").  ASUF 162.  Both the EULA and the ToU state that a player may not, under any circumstances, "use cheats, automation software (bots), hacks, mods, or any other unauthorized third-party software designed to modify the World of Warcraft experience."  ASUF 163.  From time to time, Blizzard updates its EULA and ToU, but every single version of the EULA and ToU since 2011 contains the exact same explicit prohibition on the use of "automation software (bots)."  ASUF 164.

Assent to the EULA and ToU is a precondition to accessing WoW, and Blizzard grants access to the game in reliance on the user's assent to these contracts.  ASUF 165.  At the time a user installs the game, he or she is presented with the EULA, at which time the user must scroll through the contract and click a button marked "ACCEPT."  ASUF 166.  The ToU again is presented to the user at the time he or she creates an account on Blizzard's Battle.net service, which is required to access World of Warcraft.[2]  ASUF 166.  The EULA and ToU are displayed to users at the time they connect to Blizzard's servers, and also are made available for review at Blizzard's website.  ASUF 167.  Users must review the entirety of the EULA and ToU by scrolling to the bottom of the agreements and then clicking on a box marked "ACCEPT."  ASUF 168.  If the user does not assent to these contracts, then he or she may not obtain access to the WoW game world, but may return the product for a refund of the purchase price or any unused subscription fees.  ASUF 169.

**Blizzard's Ongoing Efforts to Combat and Control WoW Hacking and Botting.**  Blizzard actively polices WoW for the unauthorized and improper use of bots, hacks, or other cheats through use of various technological measures.

---

[2] The user is actually presented with a document called "Battle.net Terms of Use" at this point.  The prohibition against bots is identical between the Battle.net TOU and WoW TOU, but the WoW TOU does not contain the Termination provision that Defendants Rely on for their "timing" argument (Mot. at 20).  Venable Decl., Ex.H; Rice Decl., Ex. 2.

Mitchell Silberberg & Knupp LLP

5487481.10

5

ASUF 170.  Blizzard also engages in a variety of manual detection and anti-cheat techniques.  ASUF 171.  Blizzard hires an enforcement team (known as the "Risk Team") which is tasked with the responsibility of policing the game, including by analyzing data for signs or behaviors that reflect that a character is being automated, by reviewing and investigating customer complaints, and by identifying new cheating products that have been introduced into the game.  ASUF 171.  Defendants' Pocket Gnome software was identified as a threat by the Risk Team in 2008, and Shadow Bot was identified as a threat in 2012.  ASUF 172.  In addition, Blizzard employs a large number of customer service representatives.  ASUF 173.  These representatives are tasked with, among other things, responding to WoW users who complain about bots in WoW, and managing customer service "tickets" for these complaints.  ASUF 173.  Typically, if a user is found to be "botting," Blizzard will suspend or revoke the user's account (known colloquially as being "banned").  ASUF 174.  Many Pocket Gnome and Shadow Bot users have been reported as cheaters and botters by other players, and many have received bans or warnings from Blizzard as a result of their use of the Bots.  ASUF 175.

**The Defendants.**  Defendants Becker and Fraser jointly (and exclusively) own and control the corporate defendant, Ceiling Fan LLC, an Ohio Limited Liability Company formed in 2011.  ASUF 177.  Becker and Fraser respectively use the online aliases "Tanaris4" and "Jokur."  ASUF 178.

**The Bots.**  Defendants are in the business of selling and distributing two pieces of computer software -- Pocket Gnome and Shadow Bot (collectively, the "Bots").  ASUF 183.  Pocket Gnome and Shadow Bot are software "bots" that, when installed on a player's computer, enable the player to fully "automate" his or her play of WoW (Pocket Gnome works on Apple Mac systems and Shadow Bot works on Windows PCs.)  ASUF 183.  The Bots engage in repetitive and elongated play of WoW for the player while he or she is away from the computer or engaged in other activities.  ASUF 184.  Players who purchase the Bots can use them to

exploit WoW's reward system by collecting virtual currency, items, and experience without actually playing the game, including for periods of time impossible for human players (for example, through the night or for hundreds of hours without interruption). ASUF 185. In this way, users of the Bots can gain a significant advantage over non-botting players. ASUF 186. They also can make (real-world) money by selling the items they receive on unauthorized online auction houses. ASUF 187. The Bots are single-purpose software products; they operate *only* with WoW, and cannot be used with any other computer game. ASUF 188. In addition, Defendants offer for sale an "enhancement" to Pocket Gnome, called "Pocket Goblin." ASUF 189. Pocket Goblin is a collection of software "hacks" or "cheats" that allow players to engage in activities restricted by the game, such as flying, walking through walls, or moving faster. ASUF 189.

Defendants promote and sell the Bots on dedicated websites located at www.pocketgno.me and www.shadowbot.net. ASUF 190. Defendants sell access to their Bots for a start-up fee of $25.00 and monthly license fee of $8.99. ASUF 191. Defendants license Pocket Goblin to Pocket Gnome users for an additional $2.99 per month. ASUF 191. As of July 2012, Defendants had sold in excess of 2,000 licenses for these products, at no less than $8.99 per month. ASUF 192. However, in just over a year, Defendants' sales skyrocketed to around *7,000* licenses, possessed by more than 6,000 unique users. ASUF 192. As of early 2013, Defendants received more than $289,000 in connection with the Bots. ASUF 193.

**Defendants' Ongoing Support And Involvement With Their Bots And Users.** Defendants do not sell their Bots, but rather sell initial access and a temporary month-long license, which is automatically renewed each month until the user elects to cancel. ASUF 194. For the Bots to work for a user, they must be activated, and Defendants have the ability to cancel or terminate a license at any time and for any reason. ASUF 195. Defendants also maintain an online database

whereby they can monitor the use of their Bots in real-time, including which user has a Bot active and running and for how long.  ASUF 195.  Defendants claim that between 100 and 120 of their Bots are active at any given time, though they apparently do not keep records of their users' activities.[3]  ASUF 192.  Defendants update and refine their software regularly and report to users about planned updates via their online "blog."  ASUF 196.  Defendants also offer premade downloadable "routes" for the Bots (i.e. tested paths for the bots to travel to kill monsters and collect gold) and regularly release new or refined routes.  ASUF 199.

Defendants offer ongoing support to their users.  ASUF 199, 202.  This includes support via a set of message boards where Defendants communicate with their customers, offer technical assistance, and enable users to communicate with each other concerning the Bots.  ASUF 202.  Defendants hire and pay "moderators," whose job is to review the message boards, offer helpful advice, and delete disruptive posts or users.  ASUF 203.  Defendants hold those moderators out as representatives of the company and part of the Ceiling Fan "team."  ASUF 203.  Defendants' website contains thousands of posts, including posts concerning technical issues and support, how to most effectively "farm" gold or items in WoW, the best places to bot or best "routes" to use with the bots, and how to sell WoW currency for real-world currency.  ASUF 204.

**Defendants' Knowledge That Their Software Violates the ToU and EULA.**  Defendants admit that at all relevant times, including before they started their business, they knew that Blizzard prohibited users from using bot software like Shadow Bot and Pocket Gnome.  ASUF 205.  Until a few weeks ago, the following statement appeared on the ***front page*** of the Pocket Gnome website:

---

[3]  This figure purportedly is based upon ***one*** sample, taken at 9:00 a.m. on a weekday.  Despite Blizzard's requests, Defendants have refused to produce evidence to support their claims concerning the number of concurrent users, asserting that their database is dynamic and thus they cannot preserve their user logs.  ASUF 192; Mayer Decl. [Docket No. 84], Ex. 54.  Thus, it is extremely likely that the actual number is much higher.

> **Is Pocket Gnome a violation of the Terms of Service (ToS)?**
> **Yes**.  Pocket Gnome is absolutely against the ToS.  There aren't
> enough superlatives in the English language to fully convey
> how against the rules this is.  If you get caught, you will
> probably be banned.  ***So be smart and don't get caught.***
> (emphasis added).

ASUF 206.  Defendants make similar statements on the Shadow Bot website.

ASUF 207 ("We recognize that Blizzard Entertainment is opposed to the use of bot

programs and does not authorize them in the TOS/EULA….").  Defendants admit

that when they started their business, they assessed and analyzed the risks

associated with selling bots, including that they might be sued by Blizzard for

inducing a breach of contract.  ASUF 208.  Additionally, just after Defendants

purchased Shadow Bot, the seller forwarded to Defendants a demand letter that he

had received from Blizzard.  ASUF 209.  Defendants ignored it.  ASUF 209.

**Defendants' And Their Customers' Efforts To Avoid Detection By**

**Blizzard.**  Defendants have designed their Bots to be "undetectable" by Blizzard's

automated scanning technology, and they advertise that fact extensively.  ASUF

210.  For example, Defendants advertise that the Bots are "low risk" and cannot be

detected using Blizzard's technical measures (such as memory scanning).  ASUF

210.[4]  Defendants devote time to learning about Blizzard's detection techniques.

ASUF 211.  Defendants listen to customer feedback and constantly improve or

modify their software to address possible means of detection.  ASUF 211.

Among the most popular discussion topics are reports about having accounts

banned by Blizzard and how to avoid future bans.  ASUF  212.  Defendants

contribute to and make available to their users hundreds of message board posts

dedicated to avoiding detection by Blizzard or other players – a fact advertised by

Defendants: "[t]here are multiple threads on the forums that discuss methods to

---

[4]  Defendants claim that Blizzard could modify Warden or otherwise develop
automated technology to catch their bots.  They offer no evidence to support this
claim, including that any hypothetical method would be permissible under federal
and state privacy laws.

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Mitchell
Silberberg &
Knupp LLP

5487481.10

1   prevent bans."  ASUF 212.  In fact, Defendants provide a specific "banned

2   section" for their members to give them a "place… to report in the event they get a

3   ban" and to advise other users of how they were caught (so that others do not

4   repeat their mistakes).  ASUF 213.  These forums contain advice such as "If you

5   are banned, admit nothing," and "if you plan ahead…you can just claim your

6   password was compromised."  ASUF 213, 214.  Defendant Fraser posted: "One

7   day I will write a mini-novel in here to explain what I think is the best approach to

8   botting with zero bans."  ASUF 215.  Some posts even are "stickied," which means

9   that a moderator has flagged the post as one that is so important that it should

10   remain at the top of the forums.  ASUF 216.

         **Procedural History**.  This action was filed on December 14, 2011.  On

12   August 15, 2013, Blizzard filed a Motion for Partial Summary Judgment on

13   liability.  That same day, Defendants filed this Motion.  Trial in this action is

14   scheduled for November 4, 2013.  Discovery is closed.

**II.   BLIZZARD, NOT DEFENDANTS, IS ENTITLED TO SUMMARY JUDGMENT ON ITS TORTIOUS INTERFERENCE CLAIM.**

         As Defendants admit, California law applies to this claim, and under

18   California law the elements of a claim for intentional interference with contractual

19   relations are: (1) a valid contract between plaintiff and a third party; (2)

20   defendant's knowledge of the contract; (3) defendant's intentional acts designed to

21   induce a breach or disruption of the contractual relationship; (4) actual breach or

22   disruption of the contractual relationship; and (5) resulting damages.  See Pac. Gas

23   & Elec. Co. v. Bear Stearns & Co., 50 Cal. 3d 1118, 1126 (1990); Craigslist, Inc.

24   v. Naturemarket, Inc., 694 F. Supp. 2d 1039, 1059-60 (N.D. Cal. 2010) (entering

25   judgment against defendant for inducing breach of website terms of service).

26   Defendants, however, ignore the critical differences between claims for

27   interference with *existing contracts* and claims for interference with *prospective*

28   *economic advantage*.  The legal protections offered by California law for the

1   former is significantly greater than for the latter.  <u>Della Penna v. Toyota Motor</u>

2   <u>Sales, U.S.A., Inc.</u>, 11 Cal. 4th 376, 392 (1995).  As a result, for Blizzard to prevail

3   on its interference claim, it need not establish that "defendant's conduct [is]

4   wrongful apart from the interference with the contract itself."  <u>Quelimane Co. v.</u>

5   <u>Stewart Title Guar. Co.</u>, 19 Cal. 4th 26, 55 (1998).

6        Defendants do not dispute that (1) Blizzard possesses valid, enforceable

7   contracts with all of its customers and every version of those contracts since they

8   commenced operations prohibited the use of bots such as Defendants', (2)

9   Defendants were aware of the ToU and EULA at all relevant times, including

10  before they started operating their business and distributing their Bots, and (3)

11  Defendants' customers ***necessarily*** breach the ToU and EULA each time they use

12  Defendants' Bots.  Thus, their arguments are limited to the claims that they did not

13  engage in overt acts of interference, did not induce breaches of every version of the

14  ToU and EULA, and did not cause any harm to Blizzard.  Defendants' arguments

15  ignore or disregard the undisputed facts and are unsupported by the law.

16      A.    <u>**Defendants Engaged In Intentional Acts Designed To Induce**</u>
<u>**Breaches of The ToU and EULA.**</u>

17

18       Shadow Bot and Pocket Gnome are single-purpose products that have ***no***

19  ***use other than*** to play WoW in violation of the ToU and EULA.  ASUF 188.

20  Defendants thus intentionally induced breaches by their customers when they

21  created, marketed, advertised, and sold these products knowing and intending that

22  they would be used to bot in WoW in breach of the ToU and EULA.  That alone is

23  sufficient to satisfy this element.  <u>MDY Indus., LLC, v. Blizzard Entertainment,</u>

24  <u>Inc.</u>, No. CV-06-2555, Docket No. 82, Order re: Summary Judgment (D. Ariz. July

25  14, 2008) ("Nor is there a genuine dispute that MDY has intentionally interfered

26  with the contract.  MDY actively promotes the use of Glider even though it knows

27  that using Glider breaches the TOU."), <u>aff'd in part</u>, <u>rev'd in part</u>, <u>MDY</u>, 629 F.3d

28  928, 957 (9th Cir. 2010) ("Glider sales are the but-for cause of Glider users' breach

1  of the operative ToU."); See also Quelimane, 19 Cal. 4th at 56 (defendant engages

2  in intentional interference where it knows that breach is the "necessary

3  consequence of his action.").  But Defendants' inducement goes further.

4  Defendants advertise that while their products violate the ToU and EULA, they are

5  not readily detectible by Blizzard, are "low risk," and "Pocket Gnome users

6  experience an extremely small amount of bans."  ASUF 210.  Defendants also tell

7  users that while they "will be banned" if caught, they will be safe as long as they

8  are "*smart and don't get caught*."  ASUF 206.  To cement this message

9  Defendants then offer extensive advice to their customers so that they "don't get

10  caught," and they advertise that they have an entire message board and online

11  community dedicated to the issue of user bans.  ASUF 212, 213.[5]  Knowing that

12  WoW prohibits the use of bots, Defendants embed their website with metatags for

13  "WoW" and "Warcraft," ASUF 218, to ensure that links to their websites will be

14  returned in Google searches for WoW and related products.[6]  Defendants also

15  purchase Google keywords for WoW and placed banner ads on websites dedicated

16  to cheating in WoW, such as Ownedcore.com, a community dedicated to "World

17  of Warcraft Exploits, Hacks, Bots and Guides."  ASUF 218, 219.

18  　　　Defendants' interference continues even after the initial purchase is made.

19  Contrary to Defendants' claim that they are merely "using a website to passively

20  market [the Bots]" (Motion at 13), Defendants are active and ongoing participants

21  in their customers' activity.  Defendants downplay or ignore that the Bots are a

22  *subscription service*, requiring initial activation by Defendants and a continuing

23  monthly payment.  ASUF 191,194.  Defendants monitor their users' activities and

---

[5]  Defendants' claim that they "alert" their customers that the use of their software violates the ToU and EULA (Motion at 5) is disingenuous.  Defendants' purported "warning" about the EULA and ToU is not intended to discourage use of the Bots in WoW but to advise customer that notwithstanding the ToU and EULA, the Bots can be used in WoW without "get[ting] caught."

[6]  See Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 133, 154 (S.D.N.Y. 2009) (defendant induced copyright infringement by "inserting 'meta tags' into the source code for their website to attract internet traffic").

can immediately disable a user's access to their Bots at their discretion (including for nonpayment). ASUF 220. They issue patches and updates and post about new features. ASUF 221. Defendants offer their customers extensive instruction on how to effectively use the Bots in WoW, including in the form of videos, instruction manuals, FAQs, and even a comprehensive (and evolving) "Wiki" page. ASUF 221. They provide customers with sample "routes" or "paths" by which the Bots move the player's character through WoW, tips on where in WoW to use the Bots, and suggestions on using the Bots for tasks such as fishing or hunting. ASUF 199. Defendants also offer extensive customer support about how to respond to complaints made by other players and how to avoid account bans. ASUF 199, 212, 213. Cf. Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, 545 U.S. 913, 936 (2005) (inducement to infringe copyrights is shown by "advertising an infringing use or instructing how to engage in an infringing use.")

In light of the foregoing, whether Defendants approached, threatened, or otherwise coerced any specific customer to breach the ToU or EULA is beside the point.[7] Defendants enable and encourage all of their customers to engage in breaches. California law has never limited intentional interference to acts of "coercion" or "solicitation" on a person-to-person basis, far less limited the tort to situations involving economic or personal "threats." See, e.g., Quelimane, 19 Cal. 4th at 56-57 (interference by refusing to issue title insurance on certain properties). To the contrary, courts have entered judgment against those who promote, sell, and service software products or services knowing and intending that by using those products their customers will breach their preexisting contracts. See, e.g., Craigslist, Inc. v. Kerbel, No. 11-3309, 2012 U.S. Dist. LEXIS 108573, at *52-55

---

[7] In fact, Defendants *did* solicit specific customers, such as by sending e-mail promotions and by communicating directly with customers via their message boards. ASUF 200. Defendant Fraser even recently advised a prospective customer that he could make back his subscription fees by selling in-game currency generated by Shadow Bot. ("I know a large amount of people who sell 100k gold for 100 USD"). ASUF 200.

1   (N.D. Cal. Aug. 2, 2012) (entering default judgment against defendant for

2   developing, offering, and marketing services designed to enable illegitimate uses

3   of Craigslist); <u>Naturemarket</u>, 694 F. Supp. 2d at 1046 (entering default judgment

4   against defendant for selling software to automate posting ads on craigslist.com in

5   violation of terms of service); <u>Twitter, Inc. v. Skootle Corp.</u>, No. C 12-1721 SI,

6   2012 U.S. Dist. LEXIS 87029, at *6-7, *23 (N.D. Cal. June 22, 2012) (intentional

7   interference with Twitter's Terms of Service based on the sale of bot software).

8   Defendants' counsel made the exact same argument in defense of Blizzard's claims

9   in the <u>MDY</u> action, and it was rejected by the Arizona district court and the Ninth

10  Circuit Court of Appeals.  <u>Compare</u> MDY's Appellate Brief [Kohler Decl., Ex. 4]

11  ("[MDY] does not actively induce or encourage Warcraft players to breach a

12  contract") <u>with</u> <u>MDY</u>, 629 F.3d at 955 ("MDY intentionally interfered with

13  Blizzard's contracts.").

### B.   **Defendants' Conduct Resulted In Breaches Of The EULA and TOU.**

16          Defendants admit that their users breach the ToU and EULA each time they

17  use Defendants' bots, and thus their users are engaging in hundreds of breaches

18  every day.  ASUF 205, 206, 192.  Defendants' only purported defense on this

19  element is to pose a convoluted hypothetical: *if* a user subscribed to Pocket Gnome

20  or Shadow Bot but did not use either program until after Blizzard amended the

21  ToU and EULA, then Defendants might have interfered with an earlier version of

22  the EULA and TOU than the one that the customer ultimately breached.  The

23  argument is frivolous.

24          As a threshold matter, Defendants have not proffered any evidence to

25  support the hypothetical as to even a single one of their customers, far less that

26  *every one* of Defendants' customers waited until after the ToU and EULA was

27  amended (a period of several months) before using the Bots.  The argument also is

28  illogical, because Defendants' customers pay a monthly fee for the Bots (ASUF

Mitchell
Silberberg &
Knupp LLP

5487481.10

14

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

191) and thus would not subscribe unless they intended to use them promptly.
Accordingly, Defendants cannot even create a disputed issue of fact on this issue –
far less obtain summary judgment.  Nelson v. Pima Community College, 83 F.3d
1075, 1081-1082 (9th Cir. 1996) ("[M]ere allegation and speculation do not create
a factual dispute for purposes of summary judgment."); California Concrete Pipe
Co. v. American Pipe & Constr. Co., 288 F. Supp. 823, 829 (C.D. Cal. 1968) ("A
factually unsupported hypothesis is not enough to forestall summary judgment.").[8]

Defendants' "timing" argument also fails because the contractual prohibition
at issue ("You agree that you will not, under any circumstances: use cheats,
automation software (bots), hacks, mods, or any other unauthorized third-party
software designed to modify the World of Warcraft experience…") is exactly the
same in *every* version of the ToU and EULA since Defendants started their
business in 2011.  ASUF 198.  Thus, it is irrelevant which version of the ToU and
EULA was in place when a sale was made.  Defendants knew when they sold their
Bots to any particular customer that it would be used in violation of the existing
ToU and EULA as well as any future iterations of the ToU and EULA (and they
offer no evidence to the contrary.)  Moreover, there is no dispute that Defendants
provide *ongoing* inducement, support, and encouragement throughout the term of a
user's subscription.  Defendants' own website advises customers that "Pocket
Gnome will always be updated to work w/the latest version released."  ASUF 229.
Thus, under Defendants' own theory, they induced breaches of *multiple* contracts.

Finally, Defendants' novel theory that they have not interfered with an
existing contract, but with "prospective" contracts because the ToU and EULA are
"terminable at will" is plain wrong. Defendants do not induce their customers to
*terminate* the ToU or EULA (e.g., "by ending his account and stopping payments

---

[8]  Since Defendants maintain a user database, any evidence that customers did not
promptly use their Bots after purchase is in their exclusive possession.  No such
evidence ever was provided.  The undisputed evidence is that the Bots are in
constant use (Motion at 3) and the ToU and EULA are amended infrequently.

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1    of the $15 monthly subscription fee for WoW," Motion at 20).  If that were the

2    case, then Defendants' Bots would be useless.  Instead, Defendants' business

3    depends upon their customers *maintaining* and *renewing* their WoW accounts, and

4    then (secretly) breaching the terms of those accounts, while Blizzard continues to

5    perform its obligations, unaware of its customers' breaches.  See Am. Airlines, Inc.

6    v. Platinum World Travel, 769 F. Supp. 1203, 1206 (D. Utah, 1990) ("[T]he

7    defendants' business depends upon their ability to induce the plaintiff's customers

8    to breach their contractual obligations while the plaintiff continues to perform.") [9]

9    **C.    Blizzard Has Suffered Harm From The Breaches Caused By
         Defendants' Interference.**

10

11   Defendants do not dispute that the use of bots by WoW players causes harm

12   to Blizzard, and they offer no evidence to the contrary.  Nor can they dispute that

13   Pocket Gnome and Shadow Bot contribute to that harm.  Defendants admit that

14   they have sold 7,000 licenses for their Bots, and that at least 100 to 120 of their

15   Bots are running within WoW at all times.  ASUF 192.  Defendants' customers

16   have been the subject of thousands of complaints.  ASUF 223, 225.  Additionally,

17   contrary to Defendants' claim (Motion at 10) Defendants' customers have had

18   accounts banned or suspended by Blizzard (confirmed by their own message board

19   postings) for cheating and botting.  ASUF 175.  Each of these actions undisputedly

20   carries a transaction cost, which Blizzard has been forced to pay as a result of

21   Defendants' interference.  ASUF 224.

22   Moreover, while Defendants admit that, by design, it is impossible for an

23   outside observer to distinguish between their Bots and those distributed by others,

24   several WoW players nevertheless have *specifically* mentioned Shadow Bot and

25   Ceiling Fan in their complaints.  ASUF 225.  Notably, of the nearly 100,000

26   ───────────────
     [9] Defendants argue that Blizzard' claims should be limited to the "duration" of
27   version of the ToU and EULA that was in place when a Ceiling Fan customer first
     acquired his or her license.  (Motion at 20).  Leaving aside the other reasons (set
28   forth above) why the argument fails, Defendants never explain what purported
     "limitation" might be applied.

Mitchell
Silberberg &
Knupp LLP

5487481.10

16

1  complaints produced by Blizzard mentioning botting, less than one of every 1,000

2  mention *any* bot by name.  ASUF 197.  Thus, the fact that there are even 11

3  references to Defendants' Bots is highly significant and suggests that a large

4  percentage of the overall complaints pertain to those bots.[10]

5      Blizzard also spends time and money policing its system for the Bots,

6  servicing the more than 100 instances of Pocket Gnome and Shadow Bot that are a

7  constant presence on its servers, and paying its "risk team" to police and analyze

8  Defendants' Bots (identified as threats to WoW in 2008 and 2011).  ASUF 192;

9  Motion at 9 (admitting that Blizzard "spends money each year to globally identify

10  and ban accounts using software [such as the Bots].")  Defendants' customers,

11  moderators, and predecessors also admit that "[Pocket Gnome] can ruin the

12  gaming experience for others if you misuse it," and that use of the software "will

13  upset a lot of other players.  That fact is evidenced by the numerous complaints

14  received by Blizzard.  ASUF 227.  The foregoing is plainly establishes the

15  existence of some harm resulting from Defendants' acts of interference.  MDY,

16  629 F.3d at 955 ("Blizzard has proffered evidence that it was damaged by MDY's

17  conduct").  See also Twitter, Inc. v. Skootle Corp., 2012 U.S. Dist. LEXIS 87029

18  at*6, (N.D. Cal. June 22, 2012) ("Twitter alleges it has spent at least $75,000 in

19  anti-spam measures to counteract Harris's activities in violation of the TOS, and

20  that it has suffered loss of goodwill and loss of users due to the dissatisfaction with

21  the level of spam.").

22      Defendants' argument that their conduct did not cause *any* injury to Blizzard

23  because it "would have the same expenses and alleged losses with or without

24  Ceiling Fan" (Motion at 10) is demonstrably false.[11]  Defendants' more than 6,000

---

[10]  Even though Defendants purportedly can monitor the use of their bots,
Defendants offer no evidence that their Bots were not the subject of these 11
complaints or the thousands of other complaints that mention their customers.

[11]  Defendants' argument that Blizzard did not increase the size of its enforcement
team after learning of the Bots misses the point, which is that Blizzard employees
must spend some portion of their time policing for the Bots.  That the *size* of
Blizzard's enforcement team has not changed over time proves only that WoW is

Mitchell
Silberberg &
Knupp LLP

5487481.10

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Bots (more than 100 of which are constantly running) have directly caused and
continue to cause direct and immediate harm to Blizzard (including customer
complaints, user bans, enforcement costs, and server costs).  It is not necessary to
determine at this juncture whether (in addition to the harm documented above) the
widespread use of Defendants' Bots *also* caused some Blizzard players to quit the
game (though they certainly did) or harmed Blizzard's goodwill (and the precise
extent to which they did).[12]  Likewise, the Court need not decide at this stage what
Defendants' market share is or the number of sales it makes to gold-farming
companies.  These are issues relevant only to the ***measure of damages***, not to
Defendants' liability.  <u>Am. Airlines, Inc.</u> 769 F. Supp. at1207-1208 ("The plaintiff
need not document a specific instance of lost revenue in order to establish that it
has been injured and that it is entitled to damages."); <u>see also</u> <u>Naturemarket</u>, 694 F.
Supp. 2d at 1059-60 ("When third parties used Defendants' software, they
breached the TOUs, resulting in monetary and other damages to Plaintiff.").[13]

Defendants' argument also misstates the law and the parties' respective
burdens.  To establish causation for liability purposes, Blizzard need only prove
that the interference is a "substantial factor" in bringing about the harm – i.e. that it
constitutes more than an "infinitesimal" or "theoretical" cause of the injury.  <u>See</u>
<u>Bank of N.Y. v. Fremont Gen. Corp.</u>, 523 F.3d 902, 909-910 (9th Cir. 2008).
Defendants do not dispute that botting harms Blizzard and WoW in various
respects, or that Defendants' Bots cause (or, at minimum, contribute in some

---

under constant threat from insidious software programs and thus must address all
of those threats using the limited resources it has available.

[12]  Defendants extensively critique the report of Plaintiff's expert witness, Dr.
Edward Castronova.  However, it is not necessary to consider Dr. Castronova's
report to find the <u>existence</u> of harm.

[13]  Moreover, "[o]ne whose wrongful conduct has rendered difficult the
ascertainment of the damages cannot escape liability because the damages could
not be measured with exactness."  <u>Cassinos v. Union Oil Co.</u>, 14 Cal. App. 4th
1770,  1784 (1993).  Defendants have made the calculation of damages difficult
because they do not keep records of their customers' activities, they have designed
their bots to be hard to detect, and they take steps to ensure that their customers are
not seen by Blizzard.

Mitchell
Silberberg &
Knupp LLP

5487481.10

18

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

manner to) some of this harm.  Whether other bots ***also*** contribute to the overall harm (or might fill a void left by Defendants if they exit the business) does not exempt them for their own liability.  If that were the case, then no bot-maker could ever be liable for the damage to Blizzard, since each could blame the others for the harm.  It is for this reason that California law holds that ***all*** contributors to a common problem may be held liable for the overall damage to the victim.  <u>See</u> <u>Am. Motorcycle Assn. v. Superior Court</u>, 20 Cal. 3d 578, 587 (1978) (noting "the general common law principle … that a tortfeasor is liable for any injury of which his negligence is *a* proximate cause.") (emphasis in original); <u>Leko v. Cornerstone Bldg. Inspection Service</u>, 86 Cal. App. 4th 1109, 1115 (2001) ("joint tortfeasors may act in concert or independently of one another. … What is important is the relationship of the tortfeasors to the plaintiff and the interrelated nature of the harm done"). [14]  As the California Supreme Court explained:

> "When we consider the relative position of the parties and the results that would flow if plaintiff was required to pin the injury on one of the defendants only, a requirement that the burden of proof on that subject be shifted to defendants becomes manifest.  They are both wrongdoers….  They brought about a situation where the negligence of one of them injured the plaintiff, hence it should rest with them each to absolve himself if he can.  The injured party has been placed by defendants in the unfair position of pointing to which defendant caused the harm.  If one can escape the other may also and plaintiff is remediless."  <u>Summers v. Tice</u>, 33 Cal. 2d 80, 86 (1948).

Finally, Defendants make what is, in essence, a mitigation argument: namely, that Blizzard should have purchased and implemented a purported "anti-bot" software tool offered by ***Defendants***, banned users more promptly or more

---

[14]  <u>Viner v. Sweet</u>, 30 Cal. 4th 1232, 1240 (2003), is not on point.  <u>Viner</u> was not an intentional interference case, but involved claims for legal malpractice.  The plaintiff alleged that his losses were caused by several interdependent factors, ***none*** of which was sufficient in the absence of the others to bring about the harm, "they are not concurrent independent causes."  <u>Id.</u> at 1244 (emphasis added).  By contrast, Defendants' Bots cause harm to Blizzard and that harm is not dependent on the existence of other bots.

permanently, or created a more effective automated detection system (Motion at 2-4).  Defendants do not cite any authority (and none exists) for the strange proposition that a defendant may escape liability for its misconduct because the plaintiff failed to take a purported offer of "protection" or to adequately protect itself from Defendants' *own* misconduct.  The argument is no different than a burglar attempting to avoid liability by claiming that the victim should have hired him as a security guard or installed a better alarm system.  Defendants also do not cite *any* evidence to support their claims, including that their "anti-bot" software actually works or that it is possible to create an automated system to detect the Bots.  More to the point, to the extent Defendants' claim is that Blizzard failed to mitigate damages, that is not a defense to *liability*.  2 Schwing, <u>California Affirmative Defenses</u>, at 327 (2013 ed.) ("A plaintiff's failure to mitigate or ameliorate the injuries caused by a defendant is a defense not to the defendant's liability but to the amount of damages for which the defendant is liable.").

## III.   DEFENDANTS' PURPORTED AFFIRMATIVE DEFENSES ARE MERITLESS.

Defendants raise two purported affirmative defenses to the intentional interference claims.  Both are legally and factually meritless.

### A.   <u>Defendants Cannot Invoke A "Competitor's Privilege."</u>

Defendants' first affirmative defense is that their conduct is protected by the so-called "competitor's privilege."  The defense fails for the overriding reason that the privilege does *not* apply to claims involving existing contracts.  <u>Envtl. Planning & Info. Council v. Superior Court</u>, 36 Cal. 3d 188, 194 (1984) ("[A] competitor's stake in advancing his own economic interest will not justify the intentional inducement of a contract breach . . . .").  Rather, the privilege applies only to the separate and distinct tort of interference with *prospective* economic advantage.  Restatement (Second) of Torts § 768  ("One who intentionally causes a third person not to enter into a *prospective* contractual relation with another who is his

1   competitor or not to continue an existing contract terminable at will does not

2   interfere improperly with the other's relation...."). Id. at cmt. a ("This section

3   differentiates between interference with an existing contract and interference with a

4   prospective contractual relation. . . .   [C]ompetition is **not** an improper basis for

5   interference in the ***latter situation***...) (emphasis added).

6        There is good reason for this rule.  As the California Supreme Court

7   explained in Della Penna, 11 Cal. 4th at, 392 (relied on by Defendants)[15], "the

8   courts provide a damage remedy against conduct intended to disrupt an existing

9   contract precisely because the exchange of promises resulting in such a formally

10  cemented economic relationship is deemed worthy of protection from interference

11  by a stranger to the contract.  Economic relationships short of contractual,

12  however, should stand on a different legal footing…"  In other words, California

13  courts "firmly distinguish the two kinds of business contexts, bringing a greater

14  solicitude to those relationships that have ripened into agreements, while

15  recognizing that relationships short of that subsist in a zone where the rewards and

16  risks of competition are dominant." *Id.* at 392.  This view is shared by the

17  Restatement, § 768 cmt. a.  ("[A]n existing contract, if not terminable at will,

18  involves established interests that are not subject to interference on the basis of

19  competition alone").

20       The "competitor's privilege" also is inapplicable here because Defendants

21  cannot prove (and do not even attempt to prove) that they are "competitors" of

22  Blizzard.  Blizzard makes and sells video games.  It does not sell "bots" or, for that

23  matter, any product that allows a user to automate WoW gameplay.  See Shore

24  Invs., Inc. v. Bhole, Inc., 2011 Del. Super. LEXIS 537, at *38 (Del. Super. Ct.

25  Nov. 28, 2011)  (holding that "defendants' fair competition argument is . . .

26

27

28

---

[15]  Defendants misquote Della Penna as stating that "[p]erhaps the most significant privilege or justification [to tortious interference] is free competition."  The case actually states that "[p]erhaps the most significant privilege or justification ***for interference with a prospective business advantage*** is free competition…" 11 Cal. 4th at 389 (emphasis added).

**BLIZZARD'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

unpersuasive" where plaintiff and "the defendants were not in competition with each other in the marketplace."); <u>East County Physicians Med. Group, Inc. v. Aetna Life and Cas. Co.</u>, No. D038241, 2003 Cal. App. Unpub. LEXIS 5768, at *25 (2003) ("We decline to apply the privilege to… a dispute between two entities whose businesses do not ordinarily bring them into competition with one another.")  Defendants' claim that Blizzard competes with Defendants because it "sells" "products" that enable players to level characters faster (e.g., the "Scroll of Resurrection" and "Recruit a Friend") (Motion at 5) is unsupported by ***any*** evidence.  It also is wrong.  "Scroll of Resurrection" and "Recruit A Friend" are not "products," and they are not "sold."  They are features built into WoW that provide short-term in-game benefits to certain players.  In this respect, they are no different than, for example, an in-game item that allows a character to temporarily kill monsters faster.  While such an item may enable the player to gain experience at a "faster than normal" rate, its existence within WoW does not make Blizzard a competitor of Defendants or a participant in the Bot-selling business.

## B.   <u>Defendants' Interference Is Not Justified By Any "Legally Protected Interest"</u>

Defendants' second affirmative defense – that their conduct is privileged because it is undertaken to protect or vindicate a "legally protected interest" – is equally infirm.  The "legally protected interest" doctrine is an extremely limited defense that permits a defendant to avoid interference liability only when a defendant, in good faith, possesses a "legally protected interest of his own," "believes that his interest may otherwise be impaired or destroyed by the performance of the contract or transaction," and uses "appropriate means" to protect that interest.  Restatement (Second) of Torts, § 773.  <u>See also Richardson v. La Rancherita,</u>  98 Cal. App. 3d 73, 81 (Cal. App., 1979) (same).

Though Defendants bear the burden of proof on this defense, <u>Betaseed, Inc. v. U & I, Inc.</u>, 681 F.2d 1203, 1232-33 (9th Cir. 1982), they do not, and cannot,

1   articulate any "legally protected interest" that they are seeking to protect by

2   interfering with the ToU and EULA.  They certainly do not, and cannot, claim that

3   any such (unidentified) interest would be impaired or destroyed by performance of

4   these contracts, far less that they used "appropriate means" to protect that

5   purported interest.  Exactly the opposite.  Defendants admit that when they began

6   selling their Bots, they were well aware of the ToU and EULA, knew that the use

7   of the Bots would breach those contracts, and even anticipated litigation with

8   Blizzard. [16]  Thus, Defendants knew that any purported "business interest" they

9   possessed was subject to the ToU and EULA.  In fact, all of Defendants' purported

10  "business interests" *require* that their purchasers first enter into and then breach

11  the ToU and EULA.  Defendants' desire to "make a profit" (Motion at 19) is not

12  the type of "legally protected interest" that would justify interference with a valid

13  preexisting contract.  If that were the case, then the defense would swallow the

14  rule, since every act of interference is motivated by profit or self-interest.  Rather,

15  to invoke the privilege there must be a *preexisting* relationship or business interest

16  that the party wishes to protect, *and* it must be one that the law deems worthy of

17  protection, *and* the defendant must use appropriate means to protect the interest.

18      Planet Goalie, Inc. v. MonkeySports, Inc., No. 11-07263, 2013 U.S. Dist.

19  LEXIS 57499 (C.D. Cal., April 22, 2013), on which Defendants place primary

20  reliance, actually supports *Blizzard's* position.  In Planet Goalie, the parties were

21  two competing businesses engaged in the sale of hockey equipment.  Id. at *1-2.

22  The plaintiff, Planet Goalie, was created and owned by a former employee of the

23  defendant, MonkeySports.  Id. at *3-4.  The plaintiff alleged that when it

24  approached and attempted to commence a relationship with MonkeySports' long-

25  term primary supplier, MonkeySports advised the supplier that it would reduce its

26

27  ────────────────────
    [16]  In MDY, the Court found issues of fact on MDY's "justification" defense
28  because "MDY proffered evidence that it created Glider in 2005, *when Blizzard's
    ToU did not explicitly prohibit bots*."  629 F.3d at 956 (emphasis added).  That is
    not the case here.

1  orders if the supplier did business with the plaintiff.  Id. at *4  As a result of that

2  statement, the supplier ceased doing business with the plaintiff, and PlanetGoalie

3  sued MonkeySports for intentional interference.  Id.  The Court dismissed the

4  claim on numerous bases, among which was that MonkeySports was seeking in

5  good faith to protect its own business interests and relationship with the supplier by

6  appropriate means.  Id. at *12.  Critical to its finding was the fact that

7  MonkeySports "**had a continuous relationship with [the supplier] for several**

8  **years before [Plaintiff] was formed**."  See Id. at *3.  That is in stark contrast to

9  Defendants, who have no preexisting relationship to protect, and whose entire

10  business is based on soliciting Blizzard customers to enter into (or renew) contracts

11  with Blizzard and then breach those contracts. [17]

12  **IV.   DEFENDANTS ARE LIABLE FOR BREACH OF CONTRACT.**

13        Defendants **Becker and Fraser** do not seriously dispute their liability for

14  breach of the ToU and EULA.  Becker and Fraser admit that they possess WoW

15  accounts, have consented to the Terms of Service and EULA (and all updates

16  thereto) and "botted" using those accounts.  ASUF 179-181.  Both have had one or

17  more of their accounts banned, suspended, or otherwise penalized for botting and

18  other Terms of Service violations.  ASUF 182.  The individual Defendants

19  breached the ToU and EULA, and they have no defense to their breaches.  See

20  Naturemarket, 694 F. Supp. 2d at 1059 (breach of contract for violating Terms of

21  Service); Ticketmaster L.L.C. v. RMG Technologies, Inc., 507 F. Supp. 2d 1096,

22  1113 (C.D. Cal. 2007) (plaintiff likely to prevail on breach of contract claim

23  premised upon violation of Terms of Use).  Leaving aside the harm resulting from

24  the software bots that Defendants' created and tested using their WoW accounts,

25  Blizzard also has spent time and money identifying the breaches and taking

---

26  [17]  Defendants attempt to confuse the issue by claiming that some of their

27  customers may have purchased the Bots before subscribing to WoW.  Even if there were evidence of this (which there is not), it is irrelevant.  Defendants sell the Bots

28  knowing that for them to be used, the customer must create a WoW account and then breach its terms.

disciplinary actions against Becker and Fraser.  ASUF 182, 224.

As for *Ceiling Fan*, issues of fact preclude summary judgment on its liability for breach of contract.  It is undisputed that Becker and Fraser (who are the sole owners of Ceiling Fan) created at least five WoW accounts that were dedicated to botting and for testing their Bots on Blizzard servers.  ASUF 181.  To the extent Becker or Fraser was acting as an agent of Ceiling Fan when he accessed those accounts (for example, to test the Bots, create routes, or test the limits of Blizzard's detection), then Ceiling Fan also is liable for breach of contract.  Motise v. Am. Online, Inc., 346 F. Supp. 2d 563, 566 (S.D.N.Y. 2004) (third party user of a contracting party's online account is bound by the same user agreement as the contracting party even though the third party user was not presented with and did not assent to the online user agreement).  Whether Becker and Fraser used their own names or emails when they signed up for their "bot" accounts is irrelevant.  Becker and Fraser are the sole principals of Ceiling Fan, and they frequently used personal emails, home addresses, personal PayPal accounts, and even personal bank accounts to conduct business on behalf of Ceiling Fan.  ASUF 177, 228.

## V.   DEFENDANTS ARE LIABLE FOR UNFAIR COMPETITION AND UNJUST ENRICHMENT.

Defendants' request for summary judgment on the Unfair Competition and Unjust Enrichment claims merely reincorporate the arguments made with respect to the Interference claim.  See Motion at 24 ("For the reasons stated above…").  Defendants' Motion likewise should be denied as to these claims for the reasons set forth above.

### Conclusion

Blizzard respectfully requests that the Court deny Defendants' Motion.

Dated:  August 26, 2013          MITCHELL SILBERBERG & KNUPP LLP


By:   /s/ Marc E. Mayer
                    Attorneys for Plaintiff